UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE

| | |
|---|---|
| In re:<br><br>Waterville Redevelopment Company IV, LLC,<br><br>Debtor | Chapter 11<br>Case No. 24-10027 |

### ORDER DENYING DEBTOR'S MOTION TO EXTEND TIME TO FILE PLAN OF REORGANIZATION

This matter is now before the Court on the Debtor's Motion to Extend Time to File Plan of Reorganization [Dkt. No. 91]. This would be a second such extension. Opposing the motion are the United States trustee and a secured creditor, SW Legacy LLC, which has a pending motion to dismiss this case. For reasons stated in a scheduling order [Dkt. No. 94], the Court held an expedited hearing on July 18, 2024, on whether to grant the requested extension. Counsel to the Debtor, the United States trustee, and SW Legacy each offered arguments then in addition to their written submissions.[1] With the Debtor declining the opportunity to adduce additional evidence in support of its request, the Court took the matter under advisement. For reasons set forth below, the Debtor's request for a second extension of time is denied.

I.   **Background**

Some chronology and other background information are needed first for context. The Debtor began this case under chapter 11 on February 27, 2024, electing to proceed under subchapter V. That election came with pros and cons for the Debtor. Among the features of

---

[1] The subchapter V trustee expressed her consent to the requested extension through an unadorned docket entry. She did not participate in the hearing. The rationale for her consent is unknown.

1

subchapter V, a debtor is generally obligated to file a plan within 90 days. *See* 11 U.S.C. § 1189(b). Here, that meant filing a plan by May 28, 2024. Had the Debtor not elected to proceed under subchapter V, the Debtor would have had a significantly longer timeframe for filing a plan. The Debtor would have, however, been foregoing certain advantages.

To enjoy the advantages of subchapter V, the Debtor was obligated to move expeditiously toward a plan, including by disclosing its efforts in a status report and at a status conference, both mandated under subchapter V to occur within the first couple months of the case. *See* 11 U.S.C. §§ 1188(c) (requiring pre-status conference "report that details the efforts the debtor has undertaken and will undertake to attain a consensual plan of reorganization"), 1188(a) (requiring, generally, that court hold status conference within 60 days of subchapter V case commencement "to further the expeditious and economical resolution of a case under this subchapter").

The Debtor filed its status report on April 11, 2024, about six weeks before the plan was due. After stating that one purpose in seeking bankruptcy protection had been to "halt the foreclosure process" begun by SW Legacy, the Debtor reported only that it was discussing a possible forbearance agreement with SW Legacy, with an eye toward then "negotiat[ing] means to repay the indebtedness[.]" The next day, SW Legacy filed its motion to dismiss the case.[2]

---

[2] The Debtor opposes SW Legacy's motion, and the parties have agreed to an extended briefing schedule and other treatment that varies from that provided under section 1112(b)(3), with the motion to be considered and, if necessary, heard no earlier than September 2024. In connection with that matter, the Debtor and SW Legacy have filed a stipulation of facts [Dkt. No. 78]. In it, they indicate that forbearance discussions began in January or February 2024, prompting SW Legacy to pause its foreclosure sale efforts until around February 26, 2024, when "discussions regarding a long-term forbearance . . . reached an impasse." The Debtor filed its bankruptcy petition the next day—the date to which foreclosure sales had been continued.

2

On April 23, 2024, the Court held the mandatory status conference. At it, the Debtor's then-counsel disclosed that, just the day prior, an "experienced DIP lender" had provided a confidential but close-to-final term sheet for a potential loan to the Debtor, which would be used, in part, to pay off SW Legacy's claim. Perceiving no major sticking points, counsel expressed optimism that the term sheet and a plan reflecting it would be finalized in "very short order."

Around this time, the Debtor was encountering opposition to employing its chosen counsel. Ultimately, the Debtor determined that counsel would be unable to continue and that other counsel would need to be chosen.

On May 23, 2024, the Debtor asked for a 45-day extension of its May 28 statutory deadline to file a plan. At an expedited hearing on that first extension request, the Debtor's then-counsel reported that the Debtor's "DIP financing is still moving along." Counsel also reported, however, that conflict-checking internal mistakes at his law firm were prompting counsel's need to withdraw and, in turn, the Debtor's need to seek new counsel and an extension of the plan filing deadline. Counsel and the United States trustee agreed that counsel's law firm, not the Debtor, was responsible for the circumstances.

As discussed in more detail below, a "court may extend the period [for filing a subchapter V plan] if the need for the extension is attributable to circumstances for which the debtor should not justly be held accountable." 11 U.S.C. § 1189(b). Based on counsel's representations about internal mistakes, the need for an extension (i.e., to retain and acquaint new counsel before filing a plan) was arguably attributable to circumstances (i.e., law firm missteps prompting counsel's need to withdraw) for which the Debtor should not justly be held accountable. With no opposition, the Court extended the plan filing deadline as requested—to July 12, 2024 [Dkt. No. 60].

3

One day after receiving that extension, the Debtor retained successor counsel, whose employment was promptly approved without opposition. Six weeks passed. Then, on the July 12 deadline, the Debtor requested a second extension of time to file a plan. As noted, that request is now before the Court.[3]

To explain why no plan could be filed yet, the Debtor reiterates that its plan would be "premised on obtaining takeout financing to satisfy its prepetition debt, including the existing debt to [SW] Legacy." Without offering specific facts or evidence, the Debtor then adds: "Based on discussions with potential[] DIP lenders, the Debtor has determined that it will be unable to obtain that takeout financing while the [SW] Legacy Motion to Dismiss is pending." According to the Debtor, the pending motion to dismiss qualifies as a "circumstance[] for which the debtor should not justly be held accountable." Continuing, the Debtor argues that this circumstance "is delaying the formulation and finalization of a plan"—thus, warranting an extension. Specifically, the Debtor requests an extension to an indeterminate date—10 days after a disposition of the motion to dismiss.

A few more details emerged at the July 18 expedited hearing. As noted, counsel to the Debtor declined any future opportunity to offer evidence. As summarized in this paragraph, however, counsel made additional representations about the alleged circumstances and need for

---

[3] As explained in the scheduling order, the motion filed on July 12 was terminated on July 15 due to its noncompliance with a local rule. The Debtor then refiled the motion that day, having changed only the motion's title. No party has argued that the Debtor's refiled motion contains an untimely request, and, as it would not affect the outcome here, the Court has effectively treated the July 15 motion as relating back to the original timely-filed request.

an extension.[4]  The Debtor has been working with a "national DIP lender that is a player in this particular . . . segment of the market."  The Debtor obtained the aforementioned term sheet from this same lender in April.  Negotiations with that lender took place before this counsel became involved.  Contrary to the Debtor's hopes, the term sheet did not motivate SW Legacy to withdraw its motion to dismiss.  Although detailed, the term sheet is "non-binding" and "not a commitment to lend" but rather is "for purposes of discussion only."[5]  The lender will lend only to a debtor-in-possession.[6]  This and other (also unspecified) prospective DIP lenders are generally concerned that the case could be dismissed (thus ending the Debtor's status as a DIP) before any loan is approved.  At some point since April, the lending process stalled because "the diligence has not been fully done and the reason for that is that there are fees associated with the lender moving forward to do the diligence – very significant fees."  The Debtor is reluctant to pay the fees because the case might be dismissed, dooming any potential DIP loan.  Plus, the

---

[4] The Court recognizes that oral representations by counsel summarized here and elsewhere are not evidence and has not relied on them as such.  The Court discusses these representations to provide additional context.  The Court also assumes, however, that factual representations made while advocating for motions and other filings either have or are likely to have some evidentiary basis.  *See* Me. R. Prof. Cond. 3.3(a) & cmts. 2-3 (addressing counsel's duty of candor to the tribunal); *cf.* Fed. R. Bankr. P. 9011(b)(3).  Given the assurances of integrity provided by those rules and others, the Court also recognizes that it is not uncommon for courts to rely upon uncontested written submissions and factual representations by counsel when deciding whether to extend a deadline.  Here, as indicated in section 1189(b), the standard to qualify for an extension of the plan filing deadline is higher than, for example, the "for cause" or "excusable neglect" standards that might apply to other types of deadlines.  Thus, meeting the section 1189(b) standard requires more than would be required to meet those lesser standards.  Unsupported written submissions and factual representations by counsel may not be adequate alone to meet the higher standard.

[5] No term sheet appears to be part of the record in this case.  During the July 18 hearing, counsel to SW Legacy read aloud the quoted disclaimer language on his copy of the term sheet.  Counsel to the Debtor then confirmed that the language matched his copy.

[6] Counsel to the Debtor noted that the Debtor and SW Legacy have stipulated to this fact in the context of proceedings on the pending motion to dismiss.

5

Debtor has not had sufficient funds to pay such fees. The Debtor believes, however, that its assets are valued "significantly higher" than the amount owed to SW Legacy, improving the Debtor's prospects for DIP financing but also permitting the Debtor to "tr[y] to explore some other options . . . for a path going forward," which it did in the two weeks before the deadline. The Debtor "simply ran out of time in the face of what it had to accomplish" and, rather than filing "a placeholder plan," the Debtor decided to request more time.

## II.  Analysis

As noted, section 1189(b) permits the Court to "extend the period [for filing a subchapter V plan] if the need for the extension is attributable to circumstances for which the debtor should not justly be held accountable." Courts have used various approaches when interpreting and applying section 1189(b). In re Signia, Ltd., Ch. 11 Case No. 23-14384 TBM, 2024 WL 331967, *4-7 (Bankr. D. Colo. January 29, 2024) (collecting cases).

This Court is most persuaded by the correctness of what the In re Signia court termed the "Beyond-the-Debtor's-Control Standard"—that is, whether "the need for an extension is due to circumstances beyond the debtor's control." See id. at *4 (quoting In re Seven Stars on the Hudson Corp., 618 B.R. 333, 345 (Bankr. S.D. Fla. 2020)) (emphasis omitted). In addition to that standard's consistency with a straightforward reading of the statutory language, the standard is also consistent with long-standing interpretations of substantially similar statutory language in chapter 12 (section 1221), which existed well before subchapter V and section 1189(b). Id. at *8-11. The Debtor would not fare better, however, if the Court were to apply another of the standards, as the Debtor suggests. Whichever the approach, the Debtor has not met its burden of showing that the statutory criteria for granting an extension have been met. See id. at *3-4 (collecting cases).

Toward meeting that burden, the Debtor has offered: scant factual allegations in its two-page motion, no affidavit or other evidence attached to it, and the representations of its counsel. Thus, the record here is sparse. Nevertheless, given the weighty consequences that could follow from a debtor being denied more time to file a plan, the Court has carefully considered the matter in reaching the conclusions that follow.

Setting aside whether a pending motion to dismiss is a circumstance for which a debtor should not justly be held accountable, the Debtor here has not shown that "the need for the extension is attributable to" that circumstance. Conclusory assertions are insufficient to demonstrate a connection between the circumstance and inability to file a plan. The Debtor needed to show, through sufficient evidence or undisputed facts, that the pending motion to dismiss was the circumstance that prevented the Debtor from filing a plan. Moreover, other than the fact that the Debtor ran out of time, the Debtor has not shown *any* circumstance creating a need for an extension—let alone a circumstance beyond the Debtor's control.

In late April, the Debtor seemed poised to file a plan that reflected the term sheet. Nothing sufficiently explains why that could not have been achieved by July 12. The Debtor's explanation is cryptic: "Based on discussions with potential[] DIP lenders, the Debtor has determined that it will be unable to obtain . . . takeout financing [to satisfy its prepetition debt] while the [SW] Legacy Motion to Dismiss is pending." The Debtor's request for the extension then proceeds on the assumption that this type of development necessarily prevents the filing of a plan. The explanation is open to multiple interpretations, and the assumption does not hold.

One understanding of the Debtor's cryptic explanation could be that prospective DIP lenders are the ones who are unwilling to proceed, for now, due to the pending motion to dismiss. That motion, however, was pending before the Debtor obtained the term sheet that the

7

Debtor had hoped to use toward *resolving* the motion (and for filing a plan). Presumably, a purportedly experienced DIP lender would have been aware of any pending motion to dismiss before issuing a term sheet and beginning to negotiate, particularly if such motions pose barriers to lending. The motion continued to be pending when the Debtor sought a first extension of the plan filing deadline—reporting no issue with progress toward DIP financing (which, per then-counsel, was "still moving along"). Nothing explains what might have changed. The Debtor has offered nothing tending to corroborate that, at any point, the prospective DIP lender became unwilling to move forward while the motion to dismiss is pending—or anything tending to corroborate that other prospective DIP lenders have taken a similar stance.[7]

Even if the Debtor could establish such an unwillingness, that fact alone would not explain the need for an extension of the plan filing deadline. A financing process can involve uncertainties that do not inevitably thwart a plan's filing. Thus, factual details about alleged uncertainties are key when seeking to extend a plan filing deadline on that basis.

Here, the Debtor has not provided such details. The Debtor originally anticipated filing a plan based on the term sheet. The Debtor has indicated that the financing process is now being delayed but not that any material terms might change. Counsel to the Debtor projected confidence that, based on perceived asset values, the Debtor can obtain financing from a DIP lender, if the case survives a motion to dismiss. Such confidence is also indicated by the Debtor

---

[7] As indicated at the hearing, in the Court's experience, DIP lenders are not intrinsically averse to proceeding to actual lending to chapter 11 debtors-in-possession that are facing a motion to dismiss—so that a moving creditor can be paid in full, thus resolving that creditor's claim and the motion along with it. Counsel to the Debtor agreed that he could imagine that DIP lenders might generally be a source for resolving such motions. He offered only that, here, he "think[s] that the problem is one of timing and that it goes back to the issues . . .[discussed] earlier in terms of the process, payment of fees, and then the ability to get the loan approved and closed prior to the motion to dismiss potentially being granted."

8

seeking only 10 days to file a plan after such event. Nothing explains what, however, could be expected to change in that 10 days that could not have been captured in a plan filed by July 12. That is, nothing explains why the Debtor could not have filed a plan, by July 12, that was based on the term sheet—and that perhaps contained contingencies or alternatives, if needed or desired. Thus, the first understanding of the Debtor's cryptic explanation (i.e., perhaps DIP lenders are pausing progress) falls short of showing a circumstance causing a need for an extension.

Other potential understandings of that explanation could be that prospective DIP lenders are not the ones (or the only ones) impeding the process. Perhaps the need for an extension here is attributable to the Debtor's own inattentiveness to or inaction in pursuing financing as its chosen reorganization strategy. Perhaps the Debtor did not move the underwriting process forward apace, prompting the prospective DIP lender to grow concerned about the risk that the motion to dismiss posed to the prospect of having a DIP to lend to. If so, perhaps the Debtor predicted this outcome, belatedly realized it, or was blindsided. Perhaps the Debtor has been disinclined to tap additional resources, as needed, to pursue a loan that might never close if the case is dismissed.[8] Perhaps the Debtor wishes to avoid doing anything toward a plan until there is more certainty about the viability of this case in general. The Court speculates here merely to illustrate how what little is known about the situation can point to plausible scenarios in which

---

[8] Counsel's representations were ambiguous, at times, as to who was responsible for unpaid fees that reportedly stalled the due diligence process. If the prospective DIP lender unexpectedly refused to pay, there is no evidence of that either. Regardless of whether a motion to dismiss has been impacting progress, barring some financial assistance, the Debtor has lacked funds to move the process forward alone, as indicated by its monthly operating reports. If the Debtor's circumstances include being perpetually unable (or perhaps, for example, its equity holders are unwilling) to provide funds needed to proceed with financing—as the Debtor's desired reorganization strategy—such a circumstance would not seem to be innately beyond the Debtor's control such that a plan filing deadline should be extended. Rather, given the Debtor's reported financial situation immediately before and since filing its petition, that would seem like an expected complication with the Debtor's selected strategy.

9

the need for the extension is attributable to circumstances that might be, or might have been, within the Debtor's control.   It is nowhere near apparent that the pendency of the motion to dismiss brought the Debtor to the point of needing a second extension.

### III.    Conclusion

At the July 18 hearing, counsel to the Debtor plainly implied that no "*confirmable*" plan could be filed yet but did not shore up that insinuation with any specifics.   He mentioned foregoing the option of filing a "placeholder plan" but did not explain what he meant by the term—that is, what the plan might be lacking.   If one concern was that the plan's feasibility could not be shown due to lenders' wait-and-see approach, given the motion to dismiss, the confirmation process could have been paused accordingly, if needed.   If the Debtor's projected confidence in its ability to obtain financing upon surviving a motion to dismiss corresponds to reality, then any wait-and-see approach should not have prevented the Debtor from timely filing a plan.

As noted, subchapter V obligates debtors to pursue their plans expeditiously.   If they cannot meet that obligation, they must show that the failure is due to circumstances beyond their control and that those circumstances warrant providing more time.   Otherwise, they cannot be permitted to continue to benefit from the advantages of subchapter V.[9]

---

[9] To be clear, the Court is not suggesting in this decision that debtors should perfunctorily file plans.   The Court strongly discourages debtors from "filing bogus placeholder plans of reorganization . . . [that] are obviously deficient ([e.g.,]. . . containing blanks, inadequate information, and missing financials) and have no chance of confirmation . . . [but rather are] filed in an attempt to pay lip service to the 90-day Section 1189(b) requirement . . . . ."   In re Signia, 2024 WL 331967, at *1.   The Court is, however, emphasizing the importance of supporting any motion for an extension of time under section 1189(b) with sufficient facts and, when necessary, evidence to meet the standard set forth therein.

For the above reasons, the Debtor's motion is denied.

Dated: August 5, 2024

_____
Michael A. Fagone
United States Bankruptcy Judge
District of Maine